## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| HASH ASSET MANAGEMENT LTD., TAF CAPITAL PTY LTD, as trustee for the BLUEBOTTLE FUND, and NI KAIHAO, <br><br> Plaintiffs, <br><br> v. <br><br> DMA LABS, INC., ICHI FOUNDATION, NICK POORE, and BRYAN GROSS, <br><br> Defendants. | CASE NO. <br><br> **COMPLAINT** <br><br> JURY TRIAL DEMANDED |

Plaintiffs HASH Asset Management Ltd. ("HASH"), TAF Capital Pty Ltd. ("TAF Capital") as trustee for the Bluebottle Fund ("Bluebottle"), and Ni Kaihao ("Kaihao" and, collectively with HASH and TAF Capital, "Plaintiffs"), file this complaint against defendants DMA Labs, Inc. ("DMA"), ICHI Foundation ("ICHI Foundation"), Nick Poore ("Poore") and Bryan Gross ("Gross" and, collectively with DMA, ICHI Foundation, and Poore, "Defendants").

### INTRODUCTION

1.      Defendants promised that their yield earning cryptocurrency "liquidity pool" offering was safe and "decentralized." They also promised that changes to the offering would be subject to a "community vote." These representations were false. Contrary to Defendants' representations about "decentralization," Defendants maintained complete control over their yield earning liquidity pool, called Rari Pool 136. After Plaintiffs invested tens of millions of dollars' worth of stablecoin, Defendants exerted their control, made unilateral decisions, and executed secret crypto trades which caused the collapse of Rari Pool 136. As a result, Plaintiffs collectively lost $18,507,436.

2.      After conducting a crypto tracing investigation, Plaintiffs have identified that the key transactions which caused the collapse were executed by digital addresses linked to DMA and ICHI Foundation insiders. Some of these transactions were designed to prop up the price of Defendants' own cryptocurrency, ICHI. Gross, the CEO of DMA and self-appointed ICHI

Foundation "steward" admitted to transferring the "Community Treasury," which contained investors' deposits, without the required community vote. The declaration of crypto tracing expert Paul Sibenik has been attached to this complaint (the "<u>Sibenik Decl.</u>") which describes the key crypto tracing findings.[1]

3.     On January 15, 2021, Defendants issued their own crypto which they called, ICHI. Following ICHI's issuance, Defendants offered a yield earning opportunity, called Rari Pool 136. Investors, like the Plaintiffs, would provide crypto to Defendants which would fund Rari Pool 136. Borrowers who posted crypto as collateral could borrow from Rari Pool 136. The initial investors, like the Plaintiffs, would earn a yield once those debts were paid. Defendants promised that liquidity protections were in place that would shield Rari Pool 136 investors' crypto. As Plaintiffs discovered too late, the liquidity protections Defendants touted were illusory and when the opportunity arose, Defendants unilaterally removed those protections to protect their own crypto at the expense of crypto belonging to the Plaintiffs.

4.     A series of repeated crypto transactions began to threaten Rari Pool 136's viability. Unknown to Plaintiffs at the time, it appears that digital addresses attributed to Defendants executed these transactions. These transactions ultimately caused Rari Pool 136 to fail. To make matters worse, Defendants unilaterally transferred millions of dollars' worth of users' crypto out of the "Community Treasury" (defined below) and into Rari Pool 136. Defendants were supposed to only move the "Community Treasury" following the solicitation of a community vote. They did not take a vote, and that Community Treasury crypto is now lost.

5.     Defendants began their scheme by enticing investors, including Plaintiffs, to deposit valuable "stablecoins"[2] and other crypto into a Community Treasury. The Treasury then

---

[1] The Sibenik Decl. is incorporated by reference as if fully restated herein.

[2] A "stablecoin" is a form of cryptocurrency designed to have a price that does not fluctuate. The stablecoins here were meant to be worth $1.00 USD per unit. A more detailed definition of "stablecoin" may be found on page 5, *infra*.

issued new crypto called "oneTokens" to the depositing investors.  OneTokens are ICHI-designed stablecoins.

6.     Defendants also touted the benefits of an "Angel Vault," a liquidity protection device that would create a protective "buy wall" to stabilize the value of ICHI.  A "buy wall" stands ready to buy a cryptocurrency at a price in order to set the floor.  If executed successfully, a buy wall ensures that the price of a particular crypto never falls below that price.  However, a buy wall only works if there is enough liquidity to execute transactions at a given price.  The Angel Vault was supposed to be a "buy wall."  Like Defendant's other offerings, this failed.

7.     The offering required investors to first purchase oneTokens and then remit those oneTokens to Rari Pool 136.  Borrowers then pledged crypto as collateral to borrow investors' oneTokens from Rari Pool 136, and the investors earned a "yield" paid in the form of ICHI cryptocurrency.

8.     Rari Pool 136 had two other key features.  First, it had a loan-to-value ("LTV") ratio of 85%, meaning that someone pledging $100 USD worth of collateral could borrow the oneToken equivalent of $85.00.  This ratio is extremely high.  Second, Rari Pool 136 allowed borrowers to use unlimited amounts of ICHI (which is not a stablecoin) as collateral to borrow a number of cryptocurrencies, including stablecoins.

9.     HASH was one of the lead investors who participated in Rari Pool 136 by providing crypto for others to borrow.  HASH did not buy Defendants' risky ICHI.  But HASH earned ICHI as "yield" for providing stablecoins to Rari Pool 136 for others to borrow.  Bluebottle did the same.  Mr. Kaihao invested crypto in the Angel Vault but did not participate in Rari Pool 136.

10.    The primary focus of Defendants' scheme was to: (1) displace the stablecoin and other valuable cryptocurrencies from Rari Pool 136 in exchange for the highly risky ICHI; (2) use borrowed stablecoin or other cryptocurrencies to purchase more ICHI, which would drive up the price of ICHI; and (3) use that purchased ICHI as collateral in Rari Pool 136 to borrow more stablecoins and other cryptocurrencies and to continuously repeat this cycle.  This scheme was possible because ICHI could be used as both collateral for Borrowers and the proceeds of the loans

from Rari Pool 136. As a result, while Plaintiffs thought their oneTokens and other safer cryptocurrencies were protected, Rari Pool 136 ended up being completely reliant on the price of ICHI. When ICHI dropped precipitously in value, Defendants executed a series of trades to protect themselves, which caused the rapid collapse of Rari Pool 136 and the loss of nearly all the Plaintiffs' investments.

11.    The Defendants chose to issue an unregistered securities offering, complete with their own crypto, ICHI, and a "yield earning" protocol, Rari Pool 136. Defendants also lied to their investors, including Plaintiffs, who relied on these lies in deciding to trust Defendants with their money. Defendants promised their investors the safety and protection of community voting, but as soon as Defendants' own crypto was at risk, Defendants secretly executed unilateral transactions to protect their own crypto, leaving Plaintiffs with the worthless Rari Pool 136. Accordingly, Plaintiffs bring this lawsuit to hold Defendants accountable and to recover for their losses resulting from Defendants' misconduct.

## I.    THE PARTIES

12.    Plaintiff HASH is a registered Cayman Islands entity.

13.    Plaintiff TAF Capital is an Australian corporation with its principal place of business in Claremont, Australia. TAF Capital is suing as trustee for Bluebottle which is an open-ended Australian unit trust.

14.    Plaintiff Kaihao is a Chinese national who resides in Shanghai.

15.    Defendant DMA is a Delaware corporation with its principal place of business in Raleigh, North Carolina.

16.    Defendant ICHI Foundation is a Cayman Islands business entity with its principal place of business in Raleigh, North Carolina.

17.    Defendant Gross is a natural person and a citizen of North Carolina. At all relevant times Mr. Gross was CEO of DMA and the self-appointed "network steward" of ICHI.

18.    Defendant Poore is a natural person and a citizen of North Carolina. At all relevant times Mr. Poore was the Chief Technical Officer of DMA.

## II.     JURISDICTION AND VENUE

19.     This Court has subject matter jurisdiction under 28 U.S.C. § 1331 because Plaintiffs assert causes of action arising under the laws of the United States.

20.     The Court has supplemental subject matter jurisdiction over Plaintiffs' state law claims under 28 U.S.C. § 1367(a).

21.     The Court has personal jurisdiction over Defendants because DMA is subject to general jurisdiction in Delaware and the remaining Defendants are subject to specific jurisdiction in Delaware, as alleged herein, as they worked and continue to work directly with DMA with respect to the transactions that led to Plaintiffs' damages.

22.     In addition, because the facts alleged in this Complaint arise from a single transaction or occurrence, the Court also has pendent personal jurisdiction over all Defendants under the doctrine articulated in *Sierra Equity Grp., Inc. v. White Oak Equity Partners*, LLC, 650 F. Supp. 2d 1213 (S.D. Fla. 2009) (citing *Action Embroidery Corp. v. Atlantic Embroidery, Inc.*, 368 F.3d 1174, 1181 (9th Cir. 2004); *ESAB Grp. v. Centricut, Inc.*, 126 F.3d 617, 628 (4th Cir. 1997); *IUE AFL–CIO Pension Fund v. Herrmann*, 9 F.3d 1049, 1056 (2d Cir.1993)); 4A Charles Alan Wright & Arthur R. Miller, FED. PRAC. & PROC. § 1069.7, n.31 (4th ed. 2020); and because Section 27 of the Securities Exchange Act of 1934 (15 U.S.C. § 78aa) authorizes nationwide personal jurisdiction and service of process.

23.     Venue is proper in this district under Section 20 of the Securities Exchange Act of 1934 (15 U.S.C. § 78aa) and 28 U.S.C. § 1391(b)(2), or in the alternative, § 1391(b)(3).

## III.     FACTUAL ALLEGATIONS

### A.     Background on Cryptocurrency

#### i.     Cryptocurrency and Blockchain Technology

24.     "Cryptocurrency" or "crypto" refers to various digital assets including "coins" and "tokens" that are securely encrypted through blockchain technology.  A "blockchain" is a string of code that forms an immutable, distributed ledger of all transactions involving the cryptocurrency or cryptocurrencies within that blockchain.

25.     Crypto transactions are submitted to the blockchain and executed in batches called "blocks."  A "block" reflects all crypto transactions that occurred on the blockchain at a particular time.  Blocks are sequenced into a "chain."  That is why it is called a "block"-"chain."

26.     There are multiple blockchains.   The first and most popular is the Bitcoin blockchain which is home to the cryptocurrency Bitcoin (BTC).  Another popular blockchain is the Ethereum blockchain, home to the cryptocurrency Ether (ETH).  The Ethereum blockchain makes it relatively easy for anyone to create new cryptocurrencies that reside on the Ethereum blockchain. These Ethereum-based cryptocurrencies are called "ERC-20" compliant tokens.  ICHI is an ERC-20 compliant token.

27.     Cryptocurrency must be stored in a digital "wallet."  Each cryptocurrency wallet has a public key which functions like an "address" for the wallet to receive cryptocurrency.[3]  A party can pay someone in cryptocurrency by sending the cryptocurrency to the recipient's wallet address.   These public key wallet addresses are 40-digit alphanumeric strings, such as "0x36994486c6e97c170065899d8659a28d7371c8."   Anyone can use the platform Etherscan (https://etherscan.io/) to see a record of a wallet's complete transaction history.

ii.     Stablecoins

28.     Like many assets, a cryptocurrency's value is typically a function of what people are willing to pay for it.   Many people buying cryptocurrency are speculating that the cryptocurrency's price will go up.   However, there is a type of cryptocurrency, known as a "stablecoin," which is designed to always maintain a value equal to that of a stable asset, such as the U.S. dollar or gold.  Stablecoins maintain their 1:1 ratio with such assets by keeping reserves of fiat currency, commercial paper, short-term government debt, or another commodity or currency.  The value of the reserves should, when done properly, correspond to the value of the stablecoin in circulation.  A stablecoin relevant to this case is USD Coin, or "USDC."

---

[3] Cryptocurrency wallets also have a "private key," an access code that controls the wallet's contents.  The private key is kept secret, like a pin number for a bank account, as it lets the wallet's owner access and control the cryptocurrency inside.   Having a private key is akin to having possession and control of the cryptocurrency itself.

### iii.   "Decentralization"

29.     Many crypto projects purport to be "decentralized," in that they disperse control within a community of market participants that must vote on governance matters.  Decentralization and community voting rights are key selling points for market participants.  With community voting rights, a participant knows that new rules governing how his or her crypto is treated will not go into effect unless a majority of stakeholders agree to the change.  Community voting systems are meant to protect against centralized bad actors making unilateral decisions that harm stakeholders.

30.     There are several reasons why project teams may promote their protocol as "decentralized."  A primary reason is that this may help them avoid designation as a security and related SEC oversight.  Although the SEC's stance on whether some cryptocurrencies are securities is unclear, the SEC has publicly stated that Bitcoin and Ether are not "securities" because they are not centrally controlled.[4]  Under the U.S. Supreme Court's decision in *SEC v. W.J. Howey Co*., 328 U.S. 293 (1946), an investment contract is not a security unless it involves investing in a "common enterprise with the expectation of profits to be derived solely from the efforts of others."

31.     Accordingly, to avoid their cryptocurrency offering from being considered a "security," many new cryptocurrency projects label themselves a "decentralized autonomous organization" ("DAO").  While some DAOs are truly decentralized, many projects that call themselves DAOs are actually run by a few individuals or a corporate entity.

32.     "Decentralized finance" or "DeFi", describes lending, yield earning, and other transactions that are similar to traditional banking but occur through decentralized entities governed by smart contracts.  An important element of many DeFi projects is "staking."  Staking involves lending tokens to a protocol in exchange for interest, called "yield," which may or may not be denominated in the same type of token that "staker" deposited.

---

[4] *See Remarks at the Yahoo Finance All Markets Summit: Crypto*, William Hinman, U.S. SEC. & EXCH. COMM'N (June 14, 2018), https://www.sec.gov/news/speech/speech-hinman-061418.

####          iv.          Liquidity Pools

33.     Staking often occurs through an investment vehicle called a "liquidity pool." Investors stake tokens to the pool, which people can then borrow from. Lenders earn "yield" based on their pro rata percentage interest in the pool. Investors who earn yield this way are said to be "providing liquidity," "liquidity mining," or "yield farming."

####     B.     Defendants Create ICHI and Solicit Plaintiffs to Invest.

34.     Defendant Bryan Gross created the "ICHI Protocol" in or around June 2020 through October 2020.  Key components of the ICHI Protocol include: (1) ICHI, the cryptocurrency; (2) oneToken or "branded dollars," the stablecoin; (3) the Angel Vault, the "buy wall," (4) the Treasury; and (5) Rari Pool 136.

35.     OneTokens, according to Defendants, maintain their price stability by virtue of the stablecoin and other crypto assets deposited in the Treasury, which supposedly allow oneTokens to be redeemed for $1.00 each.  This, in turn, is supposed to promote confidence in the underlying crypto in the Treasury and create a self-governing "community" around that crypto.

36.     Mr. Gross—operating through a Cayman Islands financial services company—established Defendant ICHI Foundation in or around October 2021 to create further separation between him and ICHI and to bolster the misleading impression that ICHI is decentralized.  The Cayman Islands-based ICHI Foundation has a single director, whose financial services company offers "a discreet . . . approach to your corporate governance needs."[5]

37.     Upon information and belief, DMA and the ICHI Foundation are under common control.

38.     Defendants maintain a "Documents" section on the ICHI website that contains an offering memorandum.[6]  Though Defendants have since revised their "Documents," a true and

---

[5] *What We Do: Directorships*, SILVERSIDE MANAGEMENT LTD., https://silversidemanagement.ky/director-services/

[6] *Welcome to the ICHI Docs*, ICHI.ORG, https://docs.ichi.org/home/.

correct copy of the "Documents" webpage during the relevant time ("Offering Documents") is attached to this Complaint as **Exhibit A**.

39.     The Offering Documents explain that the ICHI Protocol permits the depositing of cryptocurrencies into the "Treasury" along with an equal value of USDC.  In exchange, depositors receive a oneToken.  Defendants promised that investors would have the right to vote on control over the Treasury's contents and could redeem a oneToken at any time for "exactly 1 USDC (or other hard pegged stablecoin in the [Treasury]), less a redemption fee." Ex. A at 38.

40.     Specifically, Defendants represented that oneTokens "provide holders voting power over the . . . Community Treasury which holds the scarce crypto assets and can be strategically deployed *based on community governance*." *Id.* at 33 (emphasis added).  Said differently, "[*o*]*nly* the community of each individual project can govern the treasury backing its currency." Ex. A at 5 (emphasis added).  As later events revealed, these representations were false.

41.     Defendants also falsely represented that oneTokens could be "Redeem[ed] for Exactly $ 1," and had "**No**" liquidation risk.  *Id.* at 31 (emphasis original).



oneTokens are ICHI designed stablecoins built for cryptocurrency communities. oneTokens keep their value at $1, are purely on-chain, and are supported by a community treasury in each oneToken's native project tokens. They provide the hard peg of centralized stablecoins without sacrificing on decentralization.

ICHI enables any community to deploy a project **Decentralized Monetary Authority (DMA)** to manage their oneToken.

**Table 1: Feature Comparison by Category of Stablecoin**

| Feature | Algorithmic | Fiat Backed | Crypto Backed | ICHI Stablecoins |
|---|---|---|---|---|
| Mint for Exactly $1 | No | Yes | No | **Yes** |
| Redeem for Exactly $1 | No | Yes | No | **Yes** |
| 100% On-Chain Reserves | Yes | No | Yes | **Yes** |
| Community Treasury | No | No | No | **Yes** |
| Liquidation Risk | No | No | Yes | **No** |

42.     Defendants touted oneTokens as safe investments, contrasting them with "volatile, scarce coins unusable for real business," and representing that, during recent periods of market volatility, "all oneTokens were able to maintain their pegs to exactly $1 while few other stablecoins did." *Id.* at 78, 80.

43.     In addition to the Treasury, the investment also purportedly included an Angel Vault which allows the creation of a "buy wall."  The Angel Vaults would then use Uniswap v3 concentrated liquidity to ensure that the Angel Vaults stood ready to purchase ICHI at a predetermined price.  This would establish a floor price of ICHI.

44.     But as soon became clear, Defendants statements about the Angel Vaults' purported stabilizing effect were false.  In fact:

        a.      Defendants' leveraged investment products could, and did, easily overwhelm the Angel Vault buy wall and destabilize the price of ICHI; and

        b.      To maintain stability, Angel Vaults' coding needed to be regularly updated to rebalance asset concentrations and pricing algorithms in response to continuous market changes.  Defendants did not regularly update this coding but instead did so only manually and sporadically.[7]

45.     In addition to the minting process of oneTokens, and the Angel Vault buy wall, a third part of Defendants' investment vehicle involved having new oneToken investors stake their newly acquired oneTokens in Defendants' ICHI liquidity pools to earn yield.

46.     The yield earned by investors in ICHI liquidity pools was paid in the form of ICHI crypto.  Ex. A. at 14–15.

47.     The Offering Documents disclosed certain risks of investing in ICHI liquidity pools.  Ex. A at 66–67.  Specifically, risks of technical malfunction and inherently uncertain market

---

[7] The Offering Documents state that rebalancing occurs "about once a week."  Ex. A at 27. But Defendants updated these materials to state that the rebalancing occurs only "on an as-needed basis."  *ICHI's Vaults*, ICHI Docs, https://docs.ichi.org/home/concepts/ichis-vaults.    On information and belief, Defendants never regularly rebalanced the Angel Vaults and they later updated the Offering Documents after the Rari Pool 136 collapsed because the previous version of the Offering Documents was misleading.

forces.  At no point did Defendants disclose that oneTokens did not actually confer promised voting rights or that Defendants could unilaterally move investors' crypto from the Treasury and into Rari Pool 136.

48.    In addition to the Offering Documents, Defendants published articles touting the desirability of investing in ICHI.  For example, Mr. Gross laid out a "Roadmap to $1B in Community Governed Value" which promised that Angel Vaults could insulate investors' cryptocurrency from volatile market fluctuations via the protective, stabilizing buy wall effect.[8] In another article, ICHI Foundation and DMA represented that oneTokens are "stable assets . . . creating a reliable, everyday currency that can easily be used to pay for business operations and investing in DeFi."[9]

49.    Defendants also stated that, "[a]lthough this sounds too good to be true (it is kind of), there is no magic here . . . Angel Vault introduces a unique opportunity for crypto projects to manage their token liquidity and remove market volatility.  It also offers investors . . . a unique exposure . . . usually only accessible for large market makers and sophisticated players."[10]

50.    Bryan Gross personally promoted his investment products on podcasts.  In one podcast episode, Gross cited his prior employment with IBM and Amazon to bolster his credibility (and thus his project's credibility).  Gross said he had "a very experienced team that has really zeroed in on security as a core value."[11]  He also told audiences that, if he had $1,000 to invest in cryptocurrency, he would invest it in an Angel Vault.[12]

---

[8] Brian Gross, *ICHI's Roadmap to $1B in Community Governed Value*, MEDIUM (Dec. 21, 2021), https://medium.com/ichifarm/ichis-roadmap-to-1b-in-community-governed-value-93b85a4cbfda.

[9] Daniel Tal, *Angel Liquidity Vaults: Get Comfy this Crypto Winter*, MEDIUM (Nov. 24, 2021), https://medium.com/ichifarm/angel-liquidity-vaults-uniswap-v3-supercharged-for-lps-and-crypto-projects-f15bc17b3946.

[10] Lior Goldenberg, *Breaking Down Angel Vaults*, MEDIUM (Mar. 15, 2022), https://medium.com/ichifarm/breaking-down-angel-vaults-eb3659e5b7b3.

[11] *See, e.g.*, *Inside Track with Bryan Gross from ICHI*, CRYTOQUESTION (Aug. 14, 2021), https://www.spreaker.com/user/cryp/inside-track-with-ichi.

[12] *Inside Track with Bryan Gross, Network Steward of ICHI*, CRYPTOQUESTION (Jan. 1, 2022), https://www.spreaker.com/user/cryp/inside-track-ichi-2-update.

51.     Plaintiffs reviewed the Offering Documents in or around late 2021.  Around the same time, Defendants conveyed to Plaintiffs what, in substance, was the same information quoted in the promotional articles and oral statements described above.  Plaintiffs also communicated directly with Defendants through a Discord[13] channel in which Defendants provided background concerning the nature of the ICHI investment and Rari Pool 136.

52.     HASH learned about ICHI in or around fall 2021, based on a review of the documentation on the ICHI website, including the Offering Documents, and other public sources. The main feature of the ICHI oneToken product was that it was marketed as an overcollateralized stablecoin, which could always be credited for USDC with a small fee of 0.5%.  After making initial investments in ICHI, HASH noted it was one of the largest liquidity providers and contacted the ICHI team via Discord.  On January 14, 2022, a group on Discord was created entitled "HashCIB◇ICHI."

53.     On January 20, 2021, members of the ICHI team informed HASH, via Discord, about the opportunity to invest in Rari Pool 136.  The ICHI team informed HASH that ICHI was ending "deposit rewards as now you can earn by providing on[e]UNI on Rari and use it as collateral to borrow other tokens, or just leave it there and earn just like in the deposits!"  Based upon this description and other publicly available information, HASH understood that Rari Pool 136 would permit HASH to earn yield by depositing crypto in Rari Pool 136.

54.     Based on these public solicitations from Defendants, HASH remained in contact with the ICHI team, which continued speaking with HASH through various communication channels, including, but not limited to, Discord and Telegram.  These conversations continued through mid-2022.

55.     During these communications, DMA and ICHI Foundation, through Mr. Gross, Mr. Poore, others, solicited HASH to invest in the ICHI Protocol.  In addition, the HASH team had other telephone communications with members of the ICHI project team on or about February 1,

---

[13] Discord is an online communications and messaging platform widely used throughout the crypto industry.

March 8, and March 10, 2022.  After being introduced to the team in an introductory phone call, during the March 10 call, Mr. Gross explained the mechanics of the Angel Vaults and how they were organized to the HASH team.  Mr. Gross noted that Rari Pool 136 was protected by a "liquidity pool" and that ICHI would provide rewards through Rari Pool 136.

56.     Based upon these public and private solicitations from Defendants, between December 2021 and April 2022, HASH invested the cryptocurrency equivalent of approximately $16 million USD by transferring USDC to the ICHI Treasury.  In return, HASH received an equivalent value oneTokens (in a combination of "oneUNI," "oneBTC," and "oneDODO").  HASH staked oneTokens and additional USDC to Rari Pool 136.

57.     In early January 2022, Mr. Gross solicited Bluebottle's fund manager, Michael Prendiville, to invest in Rari Pool 136, urging that "oneTokens [Bluebottle had previously purchased from Defendants] should be deposited in the new Rari [P]ool! Good yields and lots of perks."  Mr. Gross repeatedly urged Bluebottle to move its oneTokens into Rari Pool 136, explaining that Rari Pool 136 "was *my pet project* . . . . Yield is 10+% APR without rewards right now.  Rewards will bump that up."  (Emphasis added).

58.     In a series of transactions between January and late March 2022, Bluebottle invested $1,877,552.21 in "oneUNI" oneTokens that it transferred in Rari Pool 136.

59.     Mr. Kaihao held oneTokens known as oneDODO, that he invested in the Angel Vault.  Although he did not deposit his oneTokens into Rari Pool 136, he relied upon the representations made by the Defendants as described herein concerning the safety of the investment in the Angel Vault and Defendants' conduct directly caused him to lose approximately $512,000.

60.     In making these investments, Plaintiffs relied on Defendants' representations about the ICHI Protocol, including representations about how the platform would function, representations about the safeguards protecting the platform, and representations that all decisions concerning crypto deposited into the Treasury would be subject to community vote.

**C.    In Violation of Plaintiffs' Community Voting Rights, Defendants Transfer Treasury Contents to Rari Pool 136**

61.    Rari Pool 136 participants could use ICHI crypto as collateral for borrowing. This enabled Defendants to generate leverage[14] for trading while shifting most of the associated risk to the lender, because the borrowed oneTokens were stable but the collateralized ICHI was not.

62.    Rari Pool 136 also had an 85% LTV ratio.  This allowed someone to borrow up to 85% of the value of the collateral they pledged.  This increased the risk of default if the value of the collateral dropped.

63.    Beginning in January 2022 and continuing through mid-April 2022—and unbeknownst to Defendants' investors, including Plaintiffs—Defendants began shifting investor-deposited stablecoins *out* of the supposedly community-controlled Treasury, and into Rari Pool 136.  Specifically, Defendants transferred tens of millions of dollars' worth of stablecoin (oneTokens and USDC) out of the Treasury and into Rari Pool 136.

64.    Defendants did this unilaterally and without the required community vote.  This violated the governance rights that Defendants promised Plaintiffs they would enjoy as investors in ICHI.

65.    These unauthorized transfers also weakened the Angel Vaults' price-protective "buy wall," because the buy wall was formed from oneTokens, and the oneTokens depended on the Treasury for their stability.

66.    ICHI's price began climbing sharply in late March 2022.  Unbeknownst to Plaintiffs, increase in price was due to a leveraged borrowing scheme through Rari Pool 136 that Defendants were executing.

67.    The scheme worked as follows: (a) post ICHI as collateral to borrow stablecoins—including those Defendants had already moved into Rari Pool 136 without the required community vote; (b) use the borrowed stablecoins to purchase more ICHI, thus driving up the price; (c) post

---

[14] Leverage is trading with loaned funds to increase buying power. It increases potential returns, but also potential losses.

the newly acquired ICHI as collateral in Rari Pool 136 to buy more stablecoin; and (d) repeat the process.

68.     HASH became concerned as the price of ICHI continued to rise.  HASH contacted the ICHI team and discussed the matter with Bryan Gross on or around March 24, 2022.  Mr. Gross showed HASH calculations purporting to establish that the ICHI was still "undervalued."  He further assured HASH that (a) the buy wall remained strong and could absorb sales even at the increasingly higher prices if wallets began to liquidate their holdings; and (b) DMA, through the ICHI Foundation, would make necessary adjustments to the buy wall's parameters to ensure it remained strong.  These representations were false.

69.     On April 6, 2022, Defendants—again without a community vote—moved approximately $6.8 million in BTC and USDC from the Treasury and into Rari Pool 136.

70.     On April 7, 2022, several large cryptocurrency wallets engaged in the same pattern of cyclical borrowing described above, using Rari Pool 136 to leverage Plaintiffs' assets and further pump up the price of ICHI.

71.     From April 7 to April 8, 2022, the value of a single ICHI increased from $79 to $139, and the total value of all ICHI in circulation grew to $599 million.

72.     Amid this increase, Defendants emptied the rest of the oneBTC Treasury into Rari Pool 136, moving approximately $4 million in USDC without a vote.  These new stablecoins in Rari Pool 136 were borrowed almost immediately.  In fact, Defendants had now emptied the entire contents of all three Treasuries—oneUNI, oneDODO, and oneBTC—into Rari Pool 136.

73.     The net effect of these transactions was to siphon stablecoins out of Rari Pool 136 and replace them with inflated ICHI as collateral.  Further, Defendants failed to adjust the buy wall parameters to ensure its continued viability as the price of ICHI continued to climb.

74.     Now, there were tens of millions of dollars in outstanding, borrowed stablecoin—but near-zero liquidity remaining in the Angel Vault buy wall to absorb sales of any ICHI collateral.  As one Twitter user observed:[15]



---

[15]   Jonwu.eth (@jonwu_), Twitter (Apr. 12, 2022), https://twitter.com/jonwu_/status/1513857064153452545.

75.     On or around April 11, 2022, one of the Defendants' wallets sold approximately $10 million in ICHI crypto.  The value of ICHI collateral in Rari Pool 136 immediately plunged.



76.     The protocol began forcibly liquidating borrowers' holdings.  This set off a chain reaction of cascading liquidations, and a bank run occurred as investors raced to sell their ICHI or otherwise recover the crypto they had staked to Rari Pool 136.

77.     Upon information and belief, Defendants were among the first to dump their ICHI holdings, thus reaping massive illicit windfalls.

78.     Because Defendants had already emptied the Treasury to accelerate the price increase price, there was no liquidity in the Treasury from which to redeem oneTokens.

79.     As one industry observer noted, innocent investors such as Plaintiffs now faced the prospect of worthless collateral, irredeemable oneTokens, and nothing to enforce the debt obligations of Defendants who engaged in the serial borrowing scheme. [16]

---

[16]     FreddieRaynolds     (@FreddieRaynolds),     Twitter     (Apr.     11,     2022),
https://twitter.com/FreddieRaynolds/status/1513687632756318213.



80.     Plaintiffs tried diligently to mitigate their damages by liquidating their own crypto holdings from the ICHI Protocol.

81.     Bluebottle, for example, tried repeatedly to withdraw and sell its ICHI and to redeem its oneToken holdings.  But it could not do so.  Bluebottle lost approximately $1.3 million.

82.     HASH faced much the same situation. It has lost approximately $16 million and is now the largest holder of valueless oneUNI oneTokens on ICHI's network.  HASH's losses, and the cryptocurrency wallets in which it suffered those losses, are displayed in **Table 1**.

| Table 1: HASH Rari Pool Losses | |
|---|---|
| **Wallet Address** | **Losses ($ USD)** |
| 0x8D | $3,050,302 |
| 0xd7 | $1,514,979 |
| 0x0d | $304,655 |
| 0x18 | $521,419 |
| 0xBC | $806,153 |
| 0xCA | $320,172 |
| 0x14 | $162,774 |
| 0x47 | $655,446 |
| 0x83 | |
| 0xF5 | $2,735,535 |
| 0x82 | |
| 0x73 | |
| 0xdE | $6,132,300 |
| 0x5a | |
| **TOTAL** | $16,203,735 |

83.    Although Mr. Kaihao did not invest his oneDODO holdings directly into Rari Pool 136, Defendants' misconduct completely wiped out $512,000 of his assets in the oneDODO Angel Vault when these crypto assets were improperly transferred to Rari Pool 136.

84.    As observers on Twitter noted, investors like Plaintiffs had invested strong crypto assets—including fiat-backed stablecoins—into the ICHI Platform, only to "get rugged" by Defendants.[17]

---

[17] Jonwu.eth (@jonwu_) Twitter (Apr. 12, 2022), https://twitter.com/jonwu_/status/1513857064 153452545.



**D.      Defendants Conceal Their Misconduct**

85.      After executing this "rug pull" on their investors, Defendants made a series of false statements laying blame on market forces and unspecified third parties.

86.      For example, Defendants falsely stated that "our core technology—Angel Vaults and Branded Dollars [i.e., oneTokens] were not the cause of or related to yesterday's volatility."[18] The opposite is true.  Defendants' raiding of the Community Treasury was directly responsible for the price spike and collapse, as was the fact that oneTokens did not actually afford any real governance rights.

87.      In a FAQ about Rari Pool 136, DMA responded to the question "Is this a rug pull or a scam? Did the ICHI team sell tokens?" by answering "No, this is not a rug pull or scam. The ICHI team and ICHI Foundation were harmed by the issues related to Rari pool #136.  The wallet

---

[18] ICHI, *Postmortem of Pool #136*, MEDIUM (Apr. 12, 2022), https://medium.com/@ichidao/postmortem-of-pool-136-3cb22102065a.

that made the initial $10M sale is not affiliated with the ICHI team."[19]  Though falsely disclaiming a link to the first $10 million dump, Defendants did not deny selling during the collapse.

88.    In fact, (i) Defendants were responsible for the ICHI price surge; (ii) once the ICHI collapse was foreseeable to Defendants, they waited for the opportune time to dump their holdings to reap maximum return; and (iii) their actions made the resulting collapse inevitable because, among other reasons:

       a.    They raided the Community Treasury without a community vote;

       b.    They allowed ICHI to be used as collateral in Rari Pool 136;

       c.    They set the LTV ratio at an extremely high 85%; and

       d.    Secretly letting users lever up the contents of Angel Vaults would inevitably destabilize the very "stablecoins" that Angel Vaults purported to stabilize.

89.    Crypto enthusiasts on Twitter immediately questioned Defendants' explanations, noting that their ICHI Platform had essentially been a bait-and-switch that had exposed their business model as a scam.[20]

---

[19] ICHI, *ICHI – POOL #136 FAQS*, MEDIUM (Apr. 13, 2022), https://medium.com/@ichidao/ichi-pool-136-faqs-aa9ca59602f3.

[20] Senpai of the Hentai (@DegenSpartan) TWITTER (Apr. 11, 2022), https://twitter.com/DegenSpartan/status/1513692501659766787; José Bidren (@smolPOTUS) TWITTER (Apr. 12, 2022), https://twitter.com/smolPOTUS/status/1513807393662152704;    Tajer    (@omolewaAbraham) TWITTER (Apr. 13, 2022), https://twitter.com/omolewaAbraham/status/1514215248714207246.



**쩌 G 跻 じ** *Senpai* of the *Hentai*
@DegenSpartan

i feel the real innovation by ICHI x Fuse (by Rari)

is proving the business model of turning pool lenders into bagholders overnight

i wonder which other projects can also do a bait and switch of collateral



José Bidren 🧈
@smolPOTUS

Congrat to ichi team on successful 533 million dollar rug pull. Send half over to my friend @irs and we can forget about all the smol Amurekans u scam. God bless the big fish God bless amureca. $ichi $eth

4:13 AM · Apr 12, 2022 · Twitter for Android



Tajer ⚔️🦀
@omolewaAbraham

# $ICHI don't worry guys its just a healthy rug pull

notEezzy 🦐 ✔ @notEezzy · Apr 13

ichi went from $140 to $13 (~92% down) and then went from $13 to $1.9 (another ~83% down)

let this be a reminder that your bags that are down 90% can still go down another 90% from there and even that can still go down another 90% from there 👆 twitter.com/0xDamien/statu...

7:13 AM · Apr 13, 2022 from Lagos, Nigeria · Twitter for Android

90.     During a video conference with HASH that occurred on or around April 15, 2022, Mr. Gross admitted that Defendants had transferred the contents of the Community Treasury to Rari Pool 136 without a vote.  When asked for further details, including how HASH planned to satisfy its duties to its earliest investors, Gross acknowledged the need to help investors regain their lost cryptocurrency.

**E.    Plaintiffs' Investigation Exposes Defendants' Scheme**

91.     By inspecting the history of various wallets responsible for the pump-and-dump scheme, Plaintiffs linked the most active wallets involved in the borrowing to ICHI Foundation and DMA.  Certain of those crypto tracing efforts and findings are explained in further detail in the attached declaration from the crypto tracing expert, which is expressly incorporated by reference.  (*See* Sibenik Decl.)

92.     There are certain smart contracts which are administrative in nature, such that only Defendants and their agents would interact with them.  These are smart contracts that are critical to ensuring that a particular protocol works properly.  One of those smart contracts is called the "ICHI Deployer."  Plaintiffs uncovered that some of the digital addresses that executed key transactions causing Rari Pool 136's collapse have previously interacted with the ICHI Deployer. Those prior interactions appear to be testing and other maintenance functions.  These activities indicate that those digital addresses are attributable to the Defendants and their agents.

93.     One such wallet ("W1"), with the wallet address "0x4fe5f268e5053a0510 8ebaf13ebd9a825e6fb6f2," incurred over $5.6 million in unpaid trading debt. W1's transaction history shows that:

        a.      W1 interacted with a smart contract called the ICHI Deployer.  This is an administrative smart contract.  Only Defendants and their agents would have a need to participate with the ICHI Deployer.

        b.      W1 received cryptocurrency from the Treasury around the time that Defendants raided the Community Treasury.

c.   W1 engaged in the leveraged borrowing transactions, or substantially similar transactions, in Rari Pool 136 that caused ICHI to increase in price.

d.   W1 dumped more than $4 million in ICHI between March 27 and April 11, 2022, including several thousand tokens when the ICHI price was at its peak.

94.   Another wallet ("W2"), with the address "0xc8b5c6363ad036883fc663766ec d87928ad3dc36," borrowed over $15 million in stablecoins.  W2 also interacted with the ICHI Deployer smart contract way back in November 2020.  W2 engaged in the leveraged borrowing transactions, or substantially similar transactions, in Rari Pool 136 that caused ICHI to increase in price.

95.   A wallet ("W3") with the address "0x0dd4c0c16fff6693e169ef89235cb92f9d8 943ee" dumped $1.1 million in ICHI in mid-March 2022, as the ICHI price began to rise. W3 is associated with a screenname that matches the username of an ICHI Foundation employee ("IE1"), who serves as the company's Chief Technology Officer.

96.   Like W2, a fourth wallet ("W4") with the address "0x2dddb6 a69f071313580073941a44491313303b1ab" interacted with the ICHI Deployer smart contract back in November 2020, again signaling control by a founding-era ICHI employee. W4 dumped approximately $3.3 million in ICHI crypto on April 9 and 10, 2022, but not before incurring approximately $812,000 in unpaid debts. W4 transacted with W2 and W3, which are themselves controlled by Defendants.

97.   A fifth wallet ("W5") with the address "0xe4f4d41bd8da7ae7e638aeac9800e67fcd 8e2858" also received tokens from the ICHI Deployer smart contract. W5 engaged in borrowing USDC and withdrawing it into another account on April 11, 2022, as forced liquidations in Rari Pool 136 occurred. In the process, W5 netted nearly $1.6 million. It also incurred approximately $3.1 million in unpaid debt.

98.   Yet another wallet ("W6") with the address "0xfb06ec3296ae0985f66a72c7efab5b 27618d0d00" incurred $12.2 million in unpaid debt and was also involved in the leveraged borrowing transactions, or substantially similar transactions, in Rari Pool 136 that caused ICHI to

increase in price. W6 transferred some borrowed cryptocurrency to another wallet address, "0x82ceb7ce20e4c7531643ecf4b026caba5b9d3a05," which, upon information and belief, is associated with an ICHI Foundation employee ("IE2").

99.     Finally, a wallet ("W7") with the address "0xd4154916d1330a7eab4bf3e21295295 805a1ab4f" also engaged in the leveraged borrowing transactions, or substantially similar transactions, in Rari Pool 136 that caused ICHI to increase in price. W7 incurred approximately $13.1 million in debt. W7 is associated with the screen name of an ICHI Foundation employee ("IE3"), who upon information and belief, is a business associate of IE2.

100.     W6 and W7 borrowed stablecoins from Rari Pool 136 in a manner highly correlated with Defendants' unauthorized transfer of Treasury assets to Rari Pool 136 . In some instances, W6 and W7 borrowed stablecoin from Rari Pool 136 just minutes after Defendants had improperly moved those stablecoins out of the Treasury.

101.     On information and belief, Bryan Gross, DMA, the ICHI Foundation, and Nick Poore knew about, encouraged, authorized, participated in, directed, accepted the benefits from, and/or otherwise ratified the conduct of IE1, IE2, IE3, and the owners of W1, W2, W4, and W5.

102.     On information and belief, Defendants terminated the employment of several ICHI employees following the collapse of Rari Pool 136, including IE2 and IE3. On information and belief, Defendants terminated these employees to distance themselves from activities about which they knew, or which they encouraged, authorized, participated in, directed, accepted benefits from, or otherwise ratified.

## CAUSES OF ACTION

### COUNT I
### Fraud

103.     Plaintiffs repeat and re-allege each and every allegation in the preceding paragraphs as if fully set forth herein.

104.     Defendants made the following false statements of material fact to Plaintiffs:

a.      Defendants said Plaintiffs' crypto investments conferred community voting rights.  In truth, Plaintiffs had no such voting rights and Defendants maintained unilateral ability to control and dispose of the Treasury assets. Defendants raided Treasury assets without any community vote, transferring high quality crypto assets into Rari Pool 136, which they later removed through the pump and dump scheme. After the collapse of Rari Pool 136, Defendants revised the Offering Documents to state that the Treasury is "operated by multi-signature wallets that are held by a collection of delegated community members and core team members." Upon information and belief, this was always the case, and Defendants updated these statements in their Offering Documents because prior statements were inaccurate and misleading.

b.      Defendants said oneTokens could be redeemed for 1 USDC at any time.  In truth, oneTokens were not true stablecoins and Defendants could block their redemption and destabilize them.

c.      Defendants said oneTokens have no liquidation risk. In truth, Defendants' protocol forcibly liquidated investors' holdings to cure debts that others—including Defendants themselves—incurred in Rari Pool 136.

d.      Defendants said oneTokens were "stablecoins." In truth, any stability was derived only from Defendants' securing Plaintiffs' investments in the Community Treasury; keeping their word to leave assets in the Community Treasury; and permitting users to withdraw their holdings, all things Defendants stopped doing when it suited them.

e.      Defendants said Angel Vaults would be available to guard against volatility and confer "stable assets . . . creating a reliable, everyday currency that can easily be used to pay for business operations and investing in DeFi."[21] In truth—and as ICHI subsequently updated its

---

[21] Daniel Tal, *Angel Liquidity Vaults: Get Comfy this Crypto Winter*, MEDIUM (Nov. 24, 2021), https://medium.com/ichifarm/angel-liquidity-vaults-uniswap-v3-supercharged-for-lps-and-crypto-projects-f15bc17b3946.

Offering Documents to reflect—"Angel Vaults are highly risky as they allow for single-sided liquidity deposits, and use those to deposit to a liquidity pool."[22]

      f.    Defendants said the ICHI Foundation was a DAO and control over any of Defendants' products was decentralized. In truth, Defendants controlled ICHI, and the entire ICHI Platform was not a DAO but rather a traditional, centralized business. Consistent with this:

      i.    ICHI Foundation is not an unincorporated association but rather a business entity registered in the Cayman Islands.

      ii.    Bryan Gross's "Roadmap to $1B in Community Governed Value," involved a plan to "hire a larger, decentralized team for marketing, growth[,] and development." "[D]ecentralized team" is an oxymoron. A central authority is necessarily doing that hiring and marketing.

      iii.    Mr. Gross and his team controlled ICHI and Rari Pool 136. Defendants' promises of "decentralization" and "community governance" were lies; these "rights" were not guaranteed and Defendants would operate unilaterally instead of taking community votes.

      iv.    Defendants retained power to alter smart contracts at any time.

      v.    Defendants could choose to discontinue oneTokens at any time.

      g.    Defendants represented on or around March 24, 2022, that (i) the ICHI crypto remained undervalued; (ii) the Angel Vault buy wall remained strong and could handle any selling; and (iii) Defendants would make necessary adjustments to the buy wall to ensure its continued viability even as the price of ICHI climbed. In fact, the ICHI Platform could not support any further increase in the price of ICHI, the buy wall was nearing the point of collapse, and Defendants did not intend to adjust (nor did they adjust) the buy wall to protect it.

     105.    These misrepresentations were material.  Had Plaintiffs known the truth, they never would have invested in the ICHI Platform.

---

[22] *Angel Vault FAQs*, ICHI Docs v3 (last visited Oct. 27, 2022), https://docs.ichi.org/ichi-docs-v3/resources/faqs; *see also Risks*, ICHI Docs (last visited Oct. 27, 2022), https://docs.ichi.org/home/technical-resources/risks (same).

106.    Defendants made these statements intending to induce Plaintiffs' reliance. Defendants knew the statements were false or misleading or were reckless about whether the statements were false or misleading.

107.    Plaintiffs reasonably relied on the truth of these statements.

108.    As a direct and proximate result of this fraudulent conduct, Plaintiffs suffered damages in an amount to be proven at trial.

### COUNT II
### Selling unregistered securities – Section 12(a) of the Securities Act of 1933
### (15 U.S.C. § 77*l*)

109.    Plaintiffs repeat and re-allege each and every allegation in the preceding paragraphs as if fully set forth herein.

110.    ICHI and the Rari 136 offering is a "security," because it involves an investment in a common enterprise with the expectation that profits or other gain will be produced by others' efforts, as demonstrated by the foregoing allegations.

111.    Specifically, the Defendants offered "notes" to the Plaintiffs, which should have been registered as securities.

112.    Defendants used an instrument of communication in interstate commerce to do this, namely the internet, Telegram, Discord, and other forms of electronic communication.

113.    No registration statement covering ICHI or Rari Pool 136 was in effect as required by Section 5 of the Securities Act (15 U.S.C. § 77e).

### COUNT III
### Market Manipulation – Section 9(a) & (f) of the Securities Exchange Act of 1934
### (15 U.S.C. § 78i)

114.    Plaintiffs repeat and re-allege each and every allegation in the preceding paragraphs as if fully set forth herein.

115.    Through the transactions herein, Defendants effected a series of transactions raising the price of ICHI and depressing the price of oneTokens for purposes of inducing the purchase or sale of ICHI and oneTokens by others, in violation of Section 9(a)(2) of the Exchange Act.

116.    Defendants did this through a means or instrumentality of interstate commerce, namely, the Internet.

117.    As a factual and proximate result, Plaintiffs suffered damages in an amount to be proven at trial.  Defendants are liable for actual damages and reasonable costs and attorneys' fees, as authorized by § 78i(f).

## COUNT IV
## Breach of Contract

118.    Plaintiffs repeat and re-allege each and every allegation in the preceding paragraphs as if fully set forth herein.

119.    Each of the Plaintiffs is a party to a separate contract with Defendants, composed of Defendants' statements in the Offering Documents and in other public communications described in this Complaint regarding the terms of, and rights and obligations conferred by, an investment in the ICHI Platform.

120.    Under the terms of these agreements, Defendants promised, among other things, to provide software that would allow oneTokens to be redeemed for precisely $1 USD each.

121.    Defendants further promised that Plaintiffs would have the right to vote regarding the governance, use, and disposition of Community Treasury assets.

122.    Defendants breached their contractual obligations to afford voting rights to Plaintiffs by failing to call for votes when required and/or failing to respect the outcome of any such votes.

123.    Defendants breached their contractual obligations to Plaintiffs by failing to honor their redemption obligations.

124.    As a result, Plaintiffs have suffered damages equal to at least the amount of unredeemed oneTokens, plus consequential damages in an amount to be proven at trial.

## COUNT V
## Conversion

125.    Plaintiffs repeat and re-allege each and every allegation in the preceding paragraphs as if fully set forth herein.

126.   The cryptocurrency Plaintiffs deposited into Defendants' ICHI Platform was Plaintiffs' exclusive property.

127.   Defendants interfered with this property interest and took this property by, without Plaintiffs' consent or complying with community vote requirements, transferring Plaintiffs' deposits out of the Treasury and into Rari Pool 136, siphoning the value of Plaintiffs' investments via the pump-and-dump scheme, and preventing Plaintiffs from withdrawing their capital or redeeming their oneTokens.

128.   As a factual and proximate result of this conduct, Plaintiffs suffered damages in an amount to be proven at trial.

**COUNT VI**
**Breach of Fiduciary Duty**

129.   Plaintiffs repeat and re-allege each and every allegation in the preceding paragraphs as if fully set forth herein.

130.   Defendants were fiduciaries toward Plaintiffs because their relationship was one in which Plaintiffs put special trust in and reliance in Defendants and in Mr. Poore and Mr. Gross in particular. This is evident because:

a.   Plaintiffs entrusted their cryptocurrency to Defendants to deposit in Defendants' ICHI Platform with the expectation that Mr. Poore and Mr. Gross would act in Plaintiffs' best interests;

b.   Defendants enjoyed discretionary power over the operation of the ICHI Platform and the disposition of cryptocurrency deposited there;

c.   An information asymmetry existed between Defendants and Plaintiffs as to the operation and integrity of the ICHI Platform;

d.   Bryan Gross's self-appointed title was the "Steward" of ICHI;

e.   Bryan Gross has told Plaintiffs that he can influence 20% of the votes of governance tokens;

        f.      On information and belief, Mr. Gross was the only person who ever made proposals and called for investors to vote on the same; and

        g.      After Rari Pool 136 collapsed, the ICHI Foundation committed to "[r]estore trust for existing users,"[23] which presupposes that trust is needed for the project to function.

131.    Defendants thus owed Plaintiffs fiduciary duties of loyalty, care, and good faith to maximize value for Plaintiffs and to elevate Plaintiffs' interests above their own.

132.    Defendants violated their duties of loyalty and good faith by engaging in self-dealing, namely:

        a.      Engaging in a pump-and-dump scheme at their investors' expense;

        b.      Locking Plaintiffs' holdings to prevent withdrawal;

        c.      Transferring Treasury holdings without obtaining the required investor vote; and

        d.      After Rari Pool 136 collapsed, pursuing an action plan that involves once again trying to pump the price of ICHI, even though, upon information and belief, Defendants have sufficient funds to return their investors' capital.

133.    Defendants violated their duties to act with due care and on an informed basis by:

        a.      Allowing the use of ICHI as borrowing collateral in Rari Pool 136;

        b.      Secretly letting users lever up the assets from the Treasury, which inevitably destabilized the "stablecoins" used in the protocol; and

        c.      Continuing to stock Rari Pool 136 with stablecoins even after the ICHI price surge.

        d.      This lack of due care is evident in Defendants' confession that "we did not consider the possibility of users leveraging ICHI to the extent that they did." [24]

---

[23] ICHI, *The ICHI Action Plan*, MEDIUM (Apr. 15, 2022), https://medium.com/@ichidao/the-ichi-action-plan-4bac05b99f88.

[24] ICHI, *ICHI – POOL #136 FAQS*, MEDIUM (Apr. 13, 2022), https://medium.com/@ichidao/ichi-pool-136-faqs-aa9ca59602f3.

134.    As a factual and proximate result of Defendants' breaches of their fiduciary duties, Plaintiffs suffered damages in an amount to be proven at trial.

## PRAYER FOR RELIEF

Plaintiffs pray for the following relief:

135.    Compensatory and punitive damages to the extent allowed by state and federal law, but in no event less than $18,507,436;

136.    An award of attorneys' fees to the extent allowed by applicable law or contract;

137.    An award of prejudgment interest; and

138.    All such further relief as the Court determines that justice requires.

DATED:          December 27, 2022

MCDERMOTT WILL & EMERY LLP

_/s/ Ethan H. Townsend_
Ethan H. Townsend (Bar ID 5813)
1007 N. Orange St., 10th Floor
Wilmington, Delaware 19801
(302) 485-3900
ehtownsend@mwe.com

OF COUNSEL:

Joseph B. Evans (*phv* forthcoming)
Michael R. Huttenlocher (*phv* forthcoming)
Daley R. Epstein (*phv* forthcoming)
1 Vanderbilt Ave
New York, New York 10017
(212) 547-5400
jbevans@mwe.com
mhuttenlocher@mwe.com
depstein@mwe.com

Daniel-Charles V. Wolf (*phv* forthcoming)
444 N. Lake St., Ste. #4000
Chicago, Illinois 60606
(312) 372-2000
dcwolf@mwe.com